

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00405-CV

_____

KEITH HAMAKER, Appellant

V.

TIERRAH NEWMAN, Appellee

On Appeal from County Court at Law No. 2
Denton County, Texas
Trial Court No. CV-2017-03255

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

In this landlord-tenant dispute, pro se Appellant Keith Hamaker appeals the $47,520 judgment entered against him after a jury found that he breached his lease agreement with tenant Tierrah Newman, withheld her security deposit in bad faith, failed to timely repair the property, and constructively evicted Newman. We overrule the majority of Hamaker's thirteen issues on appeal for the reasons we discuss below.

However, because the full amount of damages awarded to Newman for Hamaker's constructive eviction is not supported by factually sufficient evidence, we suggest a remittitur of $4,903.37. If, within 15 days of the date of this opinion, Newman files in this court a remittitur of $4,903.37,[1] then our subsequent judgment will reform the trial court's judgment in accordance with the remittitur and, as reformed, affirm that judgment. *See* Tex. R. App. P. 46.3, 46.5. If no such remittitur is timely filed, we must reverse the trial court's judgment and remand the case to the trial court for a new trial on the issues of liability and damages. *See* Tex. R. App. P. 44.1(b); *Willis v. Donnelly*, 199 S.W.3d 262, 276 & n.27 (Tex. 2006). Further, in order to prevent a double recovery, we order the judgment modified to delete the award of damages for breach of contract.

---

[1]Thereby reducing her recovery on this claim to a total of $8,906.63.

# I. BACKGROUND FACTS

## A. NEWMAN ENTERED INTO A LEASE WITH HAMAKER

In October 2016, Newman and her mother sought to move closer to Newman's Plano workplace when she saw an online ad for a "luxury duplex" at 4043 St. Christopher Lane, one of 24 properties on the street owned by Hamaker. She contacted the phone number listed in the ad, spoke to Hamaker's wife (Donna), and arranged a viewing of the property on or about October 14 or 16, 2016.[2] Newman's and Hamaker's recollections of her initial visit differed. Newman recalled that there were several other potential tenants viewing the property and that the windows and doors were open and the air conditioning was off despite the warm weather outside. Hamaker denied the presence of "a large group of people" and that the windows or doors were open. The duplex was occupied at the time; according to Newman, there were "a lot of boxes and furniture . . . in odd places" as if someone was in the midst of moving out.

Newman was interested in the property and inquired about leasing it. Hamaker asserted that Newman asked to videoconference her mother and they told her she would have to come back later that day. Hamaker and Donna testified that Newman did return and Hamaker described Newman as "express[ing] delightful comments"

---

[2]The parties disagreed about the date. Newman testified it was October 14, Hamaker averred it was October 16.

while showing her mother the home virtually.[3]  According to Newman, Hamaker told her that he would have a "cleaning team" clean the home; that he would be "repainting, recarpeting, [and] redoing trim"; and that the appliances worked.  They signed a one-year lease that day with a move-in date of November 15, monthly rent of $1,550 per month, and a $1,850 security deposit, which Newman paid.

## B.  NEWMAN WAS DISAPPOINTED BY THE CONDITION OF THE RENTAL

According to Hamaker, he and Donna had been trimming trees at a nearby property on November 6 when Newman and her mother approached them, stated that they had been in the home, and complained that the home needed to be cleaned, damaged doorways needed to be repaired, and the carpet needed to be replaced.[4]  Hamaker testified that he had agreed and promised to get the house cleaned, the carpet replaced, and the doorways repaired.  He also claimed that he and his wife spent "26 man hours" cleaning the home, that the carpet was replaced, and that the doorways were repaired.

But according to Newman, when she arrived on November 16 to move in, the home was "just disgusting" and "filthy," and it had not been cleaned.  There was urine surrounding the master-bathroom toilet, hair in the shower, a nonfunctioning

---

[3]Hamaker found it significant that the call lasted 21 minutes.

[4]Newman mentioned this incident in her original petition and admitted in response to a request for admission to entering the home, but she later denied visiting the home on November 6 when asked at trial.  Hamaker found this significant and relies upon it in his fourth issue, a claim of perjury against Newman.

dishwasher, a "disgusting" oven, wallpaper ripped and peeling off of the walls, mold, and a musty smell. She notified Hamaker and, according to Newman, he "went irate, zero to 100, irritated, yelling at [her], calling [her] a liar," and he hung up on her repeatedly. She photographed various issues with the property and sent those to Hamaker that night via text message.[5] She described for the jury additional problems including missing blinds, exposed wires, tiles coming off the wall, wallpaper peeling off the wall, ripped crown molding, a plant growing into the house through a window frame, and an area where light was coming in through a crack in the wall.

Hamaker's recollection of Newman's move-in was different. He told the jury that Newman called multiple times on her first and second day, but that her complaints changed over the course of the calls. He remembered her first call as limited to, "I need a new oven; it's old," and her subsequent calls as requesting a new oven, a new dishwasher, new flooring, a complete repainting of the walls and ceiling, and new wallpaper. Hamaker's testimony at trial painted Newman as trying to take advantage of him and find a reason to break the lease. He explained away her concerns—in his view, the dishwasher had just a couple of missing rollers on the top rack but was still functional, the wiring she complained about in the oven was just a temperature probe, the linoleum floors were just "nick[ed]," the "exposed wiring" in a

---

[5]Those photographs were admitted at trial and shown to the jury.

bathroom exhaust fan was not exposed, and Newman had pulled back the wallpaper to make it look worse.

On November 19, Newman and her mother discovered that the dining room carpet was wet. Newman contacted Hamaker, who told her to pull up the carpet and put fans out and that he would have his maintenance man, Gary, come look at it. Gary came the next day and told Newman that he had been instructed to only investigate the leak and not to fix anything else. When he cut a hole in the wall to try to find the source of the leak, he "just fell back . . . and shook his head" and said, "[S]hit, [Hamaker]." Newman testified that the inside of the wall was full of mold and described it as "dark green and black [in] color" and "wet and damp." At trial, Hamaker dismissed any and all mold concerns.

When Newman asked Gary if he could fix the dishwasher while he was there, he "looked at it, slammed it, and said I'm not fixing this piece of - - [Hamaker] needs to replace this." But when Gary also noticed that turning on the sink caused water to "gush out" beneath it, leaving standing water, he felt he had an obligation to fix the sink, so he did. He also fixed leaks in all of the bathroom sinks. He did not fix the stove, so Newman felt it was unsafe to use. Later, Newman found mold in several other areas of the home, including the air conditioning vents. Photos of the suspected mold were admitted into evidence and shown to the jury.

## C. NEWMAN MOVED OUT AND SOUGHT A RESOLUTION

After Gary's visit to the home and the discovery of the mold, Newman and her mother decided to go to a hotel that night, and they applied to lease an apartment. Newman retained a company to test for mold and once she had the results, she and her mother determined that they could not live in the house and decided to move to the apartment.

On November 23, Newman sent Hamaker a letter informing him of her intent to terminate the lease effective December 1 due to his breach of the lease agreement. The letter also memorialized Newman's verbal and text-message communications from November 16 and 17 to Hamaker informing him that the dishwasher leaked and its top rack was broken; that there was a leak under the kitchen sink; that the garbage disposal did not work; that the oven was not in "good operating order," and she had been advised not to use it; that the condition of the home was unsanitary; that wallpaper was peeling; and that tile was "pulling up off of the ground." She included a new request that a smoke detector and garage-door opener be repaired. Finally, she reported in the letter that the home had been tested for mold, that "[t]here is a high concentration level of [m]old in the rental property and we have been recommended to leave the property due to [h]ealth and [s]afety issues," and that they had been unable to stay in the home since November 22 due to the mold issue.

Hamaker testified that he received the letter on November 25 and described it as Newman's first written request for repairs and her first mention of mold concerns.

According to Newman, Hamaker called and told her that he would sue her if she broke the lease. Hamaker drove to Dallas a few days later, on November 29, and, according to his testimony, he did not find any mold but "[a]s a precaution" sprayed areas with bleach, let them dry, and then sprayed them with a paint sealant. He also averred that he replaced some fittings on the hot water heater in the garage to repair a leak, that he installed a new smoke alarm (he claimed the wires on the existing smoke alarm had been cut), and that he cleaned three air-conditioning registers. He admitted that some of the wallpaper was peeled up but implied that Newman had done that; he also claimed that "mold is common underneath wallpaper" and that wallpaper should "never" be peeled back to expose the mold underneath.

On November 30, the pair encountered each other when Newman came to the home with movers to remove the rest of their belongings. According to Newman, Hamaker again threatened to sue her and seemed "[s]trangely confident" when he told her "it was going to be a shame when he gets a judgment against [her]." Hamaker denied being confrontational and claimed that Newman refused to speak to him.

Newman tried to reach an agreement with Hamaker for the return of her security deposit, at a minimum, but he refused to agree to anything and she described him as "in full denial that there was mold still on the property." By a letter dated December 6, Hamaker sent Newman an "itemized statement" of "deductions" from her security deposit that he claimed she owed him, including payment for carpet

cleaning, trash removal, and a reletting fee. In total, he claimed that she owed him at least $2,865.

In January 2017, Newman, through her attorney, sent Hamaker and Donna a demand letter informing them of Newman's claims of their violations of the lease, their failures to remedy or repair conditions in the home, and their bad-faith retention of her security deposit. She sought a total of $15,731.63: her $1,850 security deposit, $8,150 in statutory penalties, and $5,696.63 in reimbursements for costs incurred as a result of having to move out of the duplex and into an apartment.

### E. NEWMAN SUED HAMAKER AND HE COUNTERSUED

Hamaker did not pay Newman, and in December 2017, she filed suit against him, claiming bad-faith retention of her security deposit, failure to repair, and constructive eviction. Hamaker answered and countersued Newman for her alleged breach of the lease agreement and for "fraud and deceit." In response, Newman pleaded Hamaker's own alleged breach of the lease as a defense to any breach of the lease by Newman. Hamaker later nonsuited his fraud claim.

At trial, Newman recounted her version of events and presented testimony (1) by Kevin Thigpen, an expert witness regarding mold and mold remediation, (2) by tenants of the home both before and after her brief stint there, and (3) by her attorney regarding his fees. In response, Hamaker and Donna testified to their versions of the events leading to trial.

### 1. Thigpen's Testimony Regarding Mold

Thigpen, a licensed mold-assessment consultant, testified as an expert regarding mold and to his mold assessment of 4043 St. Christopher Lane. He inspected the inside and outside of the property on November 28, 2016, determined that there were several areas in which mold or "mold-like" substances were growing, and concluded that proper mold remediation was needed. His findings included the following:

- Overall:

  o "[V]isible mold-like growth, elevated moisture content, water damage or staining."

  o Detections of past water intrusions based on water damage and elevated moisture levels.

  o "[A]ll the windows and the rooms had some degree of water damage, either by condensation or by leaks."

  o Water damage and mold-like growths on several windowsills.

- In the dining room:

  o The presence of mold in an air-conditioning vent, confirmed by lab testing.[6]

  o Elevated moisture on the wall between the dining room and laundry closet and a "mold-like growth" in the corner.

  o Noticeable water damage.

---

[6]At trial and in his brief, Hamaker criticized the lack of lab testing or samples taken from the home, beyond the samples taken in the dining room and kitchen, to confirm the presence of mold. Thigpen acknowledged this and explained that additional samples cost more: each sample cost $100 in addition to his other fees.

- In the kitchen area:

    o An elevated concentration of mold in the kitchen area, confirmed by an air sample.

    o Mold-like growth in the cabinets.

    o Elevated moisture levels in a bottom cabinet.

    o Black standing water (a "black slurry of solution") beneath the kitchen-sink cabinet, which Thigpen assumed was the result of a plumbing leak. Thigpen testified proper mold remediation in the kitchen should involve removing the affected cabinet.

    o Thigpen did not feel safe breathing in the kitchen due to the mold presence and would not "feel good" about his family going into that kitchen.

- In the master bathroom:

    o Peeling wallpaper between the toilet and the bathtub—a moisture reading revealed that the wallpaper was not "totally saturated," but it was "somewhat wet."

    o Thigpen's suspicions of the presence of mold along the base of the bathtub.

    o "[O]bvious" water damage and mold-like growth on a windowsill.

- Elsewhere:

    o An exhaust pipe in the attic did not terminate properly through the roof.

    o A vent in the den showed "signs of mold-like growth" in addition to dust. According to Thigpen, repairing it would require having a licensed contractor cut around the vent in order to capture all the mold on the drywall and remove it.

    o Deteriorated siding and cracked paint on the exterior of the home, which exposed the siding to water damage and possible mold growth.

    o A mold-like substance on the exterior.

11

- Separated areas in bricks on the exterior.

- An opening on the front door that could result in water damage.

- No drip pan beneath the water heater in the garage, which was sitting in standing water on a wood platform, presenting a risk of the floor rotting and the water heater falling through.

Thigpen concluded that the home's condition indicated that insufficient preventative maintenance had been done and that the home had been neglected. He opined that the house required substantial remediation work due to the multiple areas showing mold-like growths. He testified that he always recommends a state-licensed contractor do the remediation work because they will know how to avoid making it worse by cross-contamination. Finally, he denied that mold could be remediated by application of a bleach solution and explained that any time mold is on a porous surface such as drywall, the only remedy is to cut and remove that drywall.

## 2. A Past Tenant's Testimony

Ray Wirth lived at 4043 St. Christopher Lane from January 2012 through October 2016, making him the immediate tenant prior to Newman. He testified to several problems at the house, including shower tiles "falling off" and "buckl[ing]," a leak in the shower, and going without air conditioning for "at least a week" every year. One time, Wirth discovered water damage beneath carpeting in the dining room, including what he described as a three-foot-wide circular black mark in the middle of the dining room. He surmised that the water was coming up through the floor.

He testified that after he reported problems to Hamaker, he would have to wait until the weekend because Hamaker insisted on making all repairs himself and would only drive down from Arkansas on weekends. According to Wirth, when Hamaker did arrive to conduct repairs, it was often late at night or other times that were inconvenient for Wirth. He also recalled reporting to Hamaker an issue with the water not working and that Hamaker waited a week before finally giving Wirth permission to hire a plumber. According to Wirth, the plumber reported that the plumbing had dirt and sand in it and that all of the faucets were blocked. Wirth paid $311 for the plumber and averred that Hamaker never reimbursed him, despite Wirth's suspicion that the plumbing issues resulted from Hamaker's installation of a sprinkler system for the St. Christopher properties.

Wirth labeled Hamaker a "[l]ousy" landlord and described Hamaker as expressing himself in a "very strong" way; he testified that they almost got into a "scuffle" over the plumbing issue. Similar to Newman's experience, Wirth described an instance when they got "within inches face to face yelling at each other, and [Wirth] was told to shut up and called some names." After Wirth filed in small-claims court attempting to recover his $311 for the plumber's bill, Hamaker countersued for over $2,000, alleging that Wirth had been late with rent payments for three years and had damaged the carpet. Wirth testified that he had asked to wire the rent money every month but Hamaker had refused and insisted he mail the check to a post-office

box in Addison, which Hamaker did not check promptly on the first of each month. They eventually settled their lawsuit.

### 3. A Subsequent Tenant's Testimony

Pablo Reyes rented 4043 St. Christopher Lane from July 2017 through August 2019. He testified that Hamaker was "very . . . manipulative" and took advantage of low-income tenants. He recalled that Hamaker would make "snide" and "intimidating" remarks and refused to put Pablo's name on the lease, instead only allowing him to put his wife's name on the lease. When asked about Hamaker's demeanor, Reyes testified that Hamaker would "explode in a heartbeat" and that he used profanity often. Reyes also testified that once the first year of the lease was over, Hamaker refused to formally renew the lease and instead insisted that they proceed on a month-to-month (holdover tenant) basis.

Reyes had similar complaints to Newman regarding uncleanliness and broken appliances. Reyes testified that the house was unclean when they arrived: "[T]here was still a big mess." He also noted that there were big black spots in the bathroom. According to Reyes, he and his wife went three weeks without a stove because it did not work when they moved in. Additionally, the dishwasher overflowed, the garbage disposal overflowed, the wallpaper in the bathroom was torn off, the shower flooded, tiles fell off the wall in the bathroom, an exhaust fan did not work, and an air conditioning unit leaked condensation from a hole in the ceiling—so much so that they had to put a bucket underneath it to keep the carpet from getting wet. He

14

elaborated that the air conditioner was "dated" and only worked "randomly," failed to stay on or cool the entire unit, leaked outside, and appeared incorrectly wired. According to Reyes, the air conditioner had exposed wires and if anything touched the unit, it would turn off. He contrasted this with the brand-new unit installed on the other side of the duplex.

At one point, Reyes called Dallas Code Enforcement about the state of the house. According to Reyes, an agent inspected the home and noted that several areas were not up to code and that there were holes in the ceiling, flooding in the bathtub, tiles coming off in the guest bathroom, and water seeping through the sheetrock "to the point where it was like a sponge when you would push it." Reyes testified that it was difficult to get Hamaker to do anything about the various problems because Hamaker refused to speak to Reyes, insisting that only Reyes's wife could speak to Hamaker because her name was on the lease. Finally, Hamaker sent a handyman to fix the bathroom tiles and leaking in the walls.

Reyes averred that Hamaker refused to use certified repair people. According to Reyes, Hamaker replaced the main fuse box in the house and afterward light bulbs would pop and burst, shooting glass everywhere, because of electrical surges. Reyes also described an instance when Hamaker showed up one Saturday after only a couple hours' notice to deliver a new stove. Hamaker had declined any installation assistance from the store and instead insisted that Reyes help him remove the old, dysfunctional

15

stove. While helping remove the stove, Reyes sustained a significant laceration that caused him lasting nerve damage.

### 4. Hamaker's and Donna's Testimonies

Hamaker and Donna spent most of their testimonies refuting Newman's recounting of events,[7] Thigpen's testimony to the presence of mold, and Wirth's and Reyes's testimonies regarding Hamaker's general demeanor, the property's state, and Hamaker's alleged failures to repair conditions at the property.

Hamaker portrayed himself as a caring landlord, testifying that he was always willing to work with tenants who may have fallen upon hard times. He disputed Wirth's testimony that Wirth had reported being without water, and he claimed that the wet spot in the dining room was "likely" caused by Wirth's dog, not by any broken pipes. He also denied Wirth's claim that the air conditioning went out for a week every year and claimed that the two times it did go out, Hamaker promptly had it repaired.

He disputed Reyes's testimony that light bulbs exploded due to improper electrical work. Hamaker claimed that the light bulbs had simply gone out and needed to be changed and testified that he changed them himself. He alleged that Reyes had accused neighbors of stealing his internet service and had accused Hamaker of slashing his tires.

---

[7]We have already discussed the pertinent portions of that testimony above.

16

Hamaker and Donna also disputed the presence of any mold, each testifying that they had never smelled nor seen any mold. He also testified that he had tested the property for water leaks before and after Newman moved out and found no evidence of any leaks. According to him, the leak in the laundry room must have developed after Newman moved in, and he claimed that he fixed it within 24 hours of Newman's discovery of it. According to Hamaker, Newman never notified him of any suspicion of mold until her November 23 letter.

Despite his denial of mold in the property, Hamaker admitted in his testimony that mold in the house would affect tenant health and safety. In addition to spraying areas with bleach and paint sealant after receiving Newman's November 23 letter, Hamaker testified that he repaired a leak in the hot water heater, inspected plumbing fixtures, reglued wallpaper that had been peeled back, inspected the carpet in the dining room, installed a smoke alarm, and left a new garage-door remote. He testified that "all of the appliances [were] in working order."

According to Hamaker, Newman supplied him with a second mold report in January 2017. He complained that she did not supply it sooner and alleged that "[w]ithin days" of receiving the second report, he and Donna went to the property and again did not observe any mold.

The trial court certified Hamaker as an expert witness regarding air-conditioning repair based on his experience as a licensed technician. He opined that

the air-conditioning ducts and registers were clean, dismissing white and black substances as ceiling texture and insulation.

Hamaker claimed that Newman "abandoned" the home on November 30 and that he and Donna knew it would be difficult to immediately relet the home during the holidays. In an attempt to attract a tenant, they lowered the rent to $1,500 and "spruce[d] the home up" by hanging new blinds and retiling the kitchen, breakfast room, and laundry room. They were able to relet the apartment on December 6, only six days after the termination date stated in Newman's letter. According to Hamaker the new tenants did not complain about appliances or mold, but he admitted on cross-examination that he had later sued those tenants, as well as Reyes.

### 5. The Jury's Verdict

At the conclusion of the trial, the jury found that (1) Hamaker breached the lease agreement and his breach harmed Newman in the amount of $11,960; (2) Newman did not breach the lease agreement or cause any damage beyond normal wear and tear; (3) the lease did not contain an underlined or bold-faced provision stating that Newman would forfeit her security deposit if she did not provide advance notice of her moving out; (4) Newman properly notified Hamaker of the conditions in need of repair and Hamaker had knowledge of those conditions complained of by Newman; (5) the conditions in need of repair affected the health and safety of an ordinary tenant; (6) Hamaker withheld the security deposit in bad faith; (7) Hamaker intended that Newman not enjoy the premises and Newman was entitled to $13,810

18

in compensation for his constructive eviction of her; and (8) Newman was entitled to recover $14,050 in reasonable and necessary attorney's fees. The trial court entered judgment accordingly and awarded Newman:

- $5,650 for Hamaker's bad-faith retention of the security deposit;

- $2,050 for Hamaker's failure to repair the property;

- $13,810 for Hamaker's constructive eviction of Newman;

- $11,960 for Hamaker's breach of the lease agreement; and

- $14,050 in attorney's fees.

## II. DISCUSSION

Hamaker presents thirteen points on appeal. We will address his evidentiary sufficiency arguments first.

### A. SUFFICIENCY OF THE EVIDENCE

In his first, second, third, seventh, and eighth points, Hamaker attacks the legal and factual sufficiency of the evidence supporting various portions of the judgment against him: (1) the amounts of damages awarded; (2) the statutory penalty for his failure to repair the property; (3) the finding that he retained the security deposit in bad faith; (7) the finding that he constructively evicted Newman; and (8) the finding that Newman did not breach the contract.

## 1. Standards of Review

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *see also Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*,

715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

Finally, we must keep in mind that the jury's role is that of the ultimate factfinder. *See Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744 (Tex. 1986) ("Findings of fact are the exclusive province of the jury . . . ."). As the factfinders, the jurors are the sole judge of the witnesses' credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). As the reviewing court, we are prohibited from substituting our judgment for that of the jury. *Id.* And we cannot make original findings of fact. *Tex. Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986). It is with that understanding that we will review the jury's findings.

## 2. Newman's Double Recovery

The jury awarded Newman $11,960 for Hamaker's breach of the lease agreement and $13,810 for his constructive eviction of Newman. We agree with Hamaker that the awards are duplicative.

It is unclear from the record exactly which costs Newman sought to recover in connection with her breach-of-contract and constructive-eviction claims, and her appellate brief does nothing to clarify this.[8] Generally, there is an overlap of

---

[8]In fact, Newman's brief explains little, offering only very brief rebuttals to Hamaker's arguments and with hardly any citations to the law. We understand that responding to pro se briefs can present challenges not often encountered when the

recoverable damages for breach-of-contract and constructive-eviction claims: both causes allow for the recovery of actual damages that may include a security deposit and moving-related expenses. *See* Tex. Prop. Code Ann. § 91.004; *Charalambous v. Jean Lafitte Corp.*, 652 S.W.2d 521, 523 (Tex. App.—El Paso 1983, writ ref'd n.r.e); *McKenzie v. Carte*, 385 S.W.2d 520, 528 (Tex. Civ. App.—Corpus Christi 1964, writ ref'd n.r.e.). But that overlap does not entitle Newman to a double recovery of such expenses. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995).

To prove her actual damages, Newman largely relied upon her demand letter to Hamaker, in which she requested "recovery for out of pocket[] costs related to leasing the Property, postage and toll fees, vacating the Property, hotel expenses . . . , and moving expenses into replacement housing." The letter was admitted into evidence, and it included the following table:

---

opposing party is represented by counsel. But that does not mean that the responding attorney is alleviated of his responsibilities to the Court and his client. We direct Newman's counsel to the Standards of Appellate Practice, both in their entirety and to the particular provisions that "Counsel . . . serve the Court by respecting and maintaining the dignity and integrity of the appellate process"; "Counsel will advise the Court of controlling legal authorities, including those adverse to their position"; and "Counsel will present the Court with a thoughtful, organized, and clearly written brief." Texas Standards of Appellate Practice, Lawyer's Duties to the Court 4, 5. It is our belief that counsel would benefit from a review of those standards.

| Date | Items | Cost |
|---|---|---|
| 16-Nov | USPS Address Change | 3.00 |
| 17-Nov | U-Haul | 75.00 |
| 18-Nov | U-Haul | 35.70 |
| 18-Nov | AB Moving (into duplex) | 567.00 |
| 18-Nov | U-Haul | 25.45 |
| 18-Nov | U-Haul | 84.04 |
| 19-Nov | Application Fee (Bella vida) | 450.00 |
| 22-Nov | QUEST (Mold Inspection) | 250.00 |
| 23-Nov | Termination Letter USPS | 22.95 |
| 23-Nov | Termination Letter FedEx | 25.75 |
| 27-Nov | Photographer | 60.00 |
| 28-Nov | Mold Inspection Sciences | 550.00 |
| 28-Nov | Potters Appliances | 75.00 |
| 29-Nov | A-Appliances | 107.70 |
| 30-Nov | Hilton Homewood | 961.24 |
| 30-Nov | Bella Vida Deposit | 750.00 |
| 1-Dec | AB Moving Team1 | 816.50 |
| 1-Dec | AB Moving Team2 | 816.50 |
| 6-Dec | UHAUL TOLLS | 6.90 |
| | Deposit for Duplex + App Fee | 1,585.00 |
| | Deposit for Dog (Duplex) | 300.00 |
| | USPS Address Change | 3.00 |
| | UHAUL TOLLS | 1.50 |
| | UHAUL TOLLS | 1.58 |
| | UHAUL TOLLS | 2.91 |
| | UHAUL TOLLS | 2.91 |
| | TX Prop Code penalty | 8,150 |
| | GRAND TOTAL | 15,731.63 |

The "TX Prop Code penalty" amount is not recoverable as damages for breach of the lease or constructive eviction as those are statutory penalties available only for a landlord's failure to repair and bad faith retention of the security deposit. *See* Tex. Prop. Code Ann. §§ 92.056, .109. Any inclusion of those penalties in the amounts awarded to Newman for breach of contract and constructive eviction was improper.

The only logical conclusion from the record is that the $11,960 and $13,810 awards were based at least in part on the expenses listed in the above table, and Newman cannot recover the same expenses for both the breach-of-contract *and* the constructive-eviction claims. To allow her to do so would be an improper double

23

recovery. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995) (prohibiting double recoveries under Texas law).

The appellate remedy in a situation of a double recovery is the rendition of judgment affording the greatest recovery, which in this case is the $13,810 constructive-eviction award. *See id.* We therefore modify the judgment to delete the breach-of-contract damages award because it represents a double recovery, and we move on to consider his evidentiary-sufficiency arguments related to the constructive-eviction portion of the judgment.[9]

### 3. Constructive Eviction

In his first and seventh issues, Hamaker attacks the jury's findings that he constructively evicted Newman and that, as a result, he owes her $13,810 in damages. We overrule his evidentiary-sufficiency arguments as they relate to the jury's determination of liability. But because the evidence is legally and factually sufficient to support only part of the amount awarded by the jury, we suggest a $4,903.37 remittitur.

### a. Liability

Constructive eviction happens when a tenant leaves the leased premises due to conduct by the landlord which materially interferes with the tenant's beneficial use of the premises. *Williamson v. Howard*, 554 S.W.3d 59, 69 (Tex. App.—El Paso 2018, no

---

[9]Because of this resolution, we need not address Hamaker's eighth issue arguing that Newman breached the contract first. Tex. R. App. P. 47.1.

24

pet.). Because the landlord's conduct destroys the fundamental reason for the lease's existence, a constructive eviction "essentially terminates mutuality of obligation as to the lease terms." *Id.* (quoting *Downtown Realty, Inc. v. 509 Tremont Bldg., Inc.*, 748 S.W.2d 309, 313 (Tex. App.—Houston [14th Dist.] 1988, no writ.)). *See also Columbia/HCA of Houston, Inc. v. Tea Cake French Bakery & Tea Room*, 8 S.W.3d 18, 22 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (discussing the elements of constructive eviction).

The jury determined that Hamaker, through material and permanent acts or omissions, intended that Newman not enjoy the premises and that Newman abandoned the premises within a reasonable time. On appeal, Hamaker does not appear to take issue with the finding that Newman abandoned the premises within a reasonable time. Rather, his argument is focused on refuting the "material and permanent" finding.[10] Specifically, he argues that the mold problem was not material because Thigpen admitted that the concentration levels fell below levels that require remediation be performed by licensed contractors; he argues that the condition was not permanent because Thigpen admitted that it could be remediated.

Hamaker's arguments fail. Whether Hamaker's actions or inactions were material and whether the condition was permanent were fact questions for the jury to

---

[10]He also seems to argue that there was no evidence that he acted intentionally. This was not a question posed to the jury. We must measure the sufficiency of the evidence in light of the charge given to the jury. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002).

resolve. A material act or omission is one that affects the use for which the property was leased, including a landlord's failure to repair a defective condition of the property. *See Downtown Realty*, 748 S.W.2d at 312–13 (upholding constructive-eviction judgment based on landlord's failure to repair heating and air conditioning system).

The jury was presented with evidence of a significant mold problem inside the property. Thigpen testified in depth to his findings of mold and "mold-like" substances throughout the property, and he testified to the fact that he himself did not feel safe breathing in the kitchen due to the presence of mold. He informed the jury of his conclusions that the home had been neglected and that substantial remediation work was necessary. He opined that application of a bleach solution would not properly remediate the mold. For their part, the Hamakers steadfastly denied that there was a mold problem. The jury was in the best position to weigh their credibility, and the evidence was legally and factually sufficient to support the jury's finding of a material omission by their failure to remedy the mold problem. *See Golden Eagle Archery,* 116 S.W.2d at 761.

Contrary to Hamaker's argument, permanency in this context does not require that the landlord's interference with the tenant's enjoyment of the premises continue forever. *See Briargrove Shopping Ctr. Joint Venture v. Vilar, Inc.*, 647 S.W.2d 329, 335 (Tex. App.—Houston [1st Dist.] 1982, no writ). We look instead to the duration of the acts or omissions; if they are short-term, they generally will not satisfy this element. *See id.* The jury was presented evidence of the Hamakers' continued denial

of the mold problem. Thigpen testified that the home's condition evidenced neglect and that insufficient preventative maintenance had been done, leaving it in such a condition to require substantial remediation work. A past tenant testified to water damage throughout the house that existed before Newman moved in, and a subsequent tenant also testified to water damage, "big black spots" in the bathroom, and water seeping through sheetrock, among other concerns. The evidence laid bare a course of conduct by Hamaker that included denying the existence of problems combined with an insistence on fixing things himself and refusing to hire professionals. Newman testified to her informing Hamaker of the issues and his refusal to timely repair the problem. Based on the facts in this record, the jury's finding that the mold issue and Hamaker's behavior constituted a constructive eviction of Newman is supported by sufficient evidence. *See id.* We therefore overrule Hamaker's seventh issue.

### b. Damages

Having held that the evidence is sufficient to support the jury's finding that Hamaker was liable for constructive eviction, we turn to its corresponding award of $13,810 in damages.

Damages are legally imposed monetary compensation for a loss or injury. *Geters v. Eagle Ins. Co.*, 834 S.W.2d 49, 50 (Tex. 1992). The fundamental purpose of economic and noneconomic damages is to "indemnify an injured party for the pecuniary loss suffered, placing him as nearly as possible in the position he would

27

have occupied but for the injury in question." *Waldon v. Williams*, 760 S.W.2d 833, 834 (Tex. App.—Austin 1988, no writ). Exemplary damages, on the other hand, are awarded as a penalty or by way of punishment and include punitive damages. *See* Tex. Civ. Prac. & Rem. Code. Ann. § 41.001(5).

A successful tenant may recover actual damages for her constructive eviction, including prepaid rent, moving expenses, and any loss which is a foreseeable consequence of the eviction. *Lazell v. Stone*, 123 S.W.3d 6, 12 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (op. on reh'g); *Charalambous*, 652 S.W.2d at 523. She may also be relieved from rent obligations. *See Lazell*, 123 S.W.3d at 12.[11] The jury has discretion to award damages within the range of evidence presented at trial, but a rational basis must exist for the jury's calculation. *Swank v. Sverdlin*, 121 S.W.3d 785, 799 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *see also Salinas v. Rafati*, 948 S.W.2d 286, 289 (Tex. 1997) ("A jury must have an evidentiary basis for its findings.").

Absent an objection to the jury charge, we review evidentiary sufficiency in light of the charge submitted even if the trial court's statement of the law was not entirely correct. *St. Joseph Hosp.*, 94 S.W.3d at 530. In this case, neither party objected

---

[11]Successful tenants may also be awarded exemplary damages. *See Charalambous*, 652 S.W.2d at 526–27. While Newman pleaded for exemplary damages, she did not argue for them at trial or request an exemplary-damages jury question. She also does not argue on appeal that she was awarded exemplary damages. We therefore conclude that she was not awarded exemplary damages by the jury.

28

to the following charge given to the jury: "What sum of money if paid now and in cash would fairly and reasonably compensate Tierrah Newman for her damages as related to [Hamaker's constructive eviction of her]?" The jury answered that $13,810 would fairly and reasonably compensate Newman.

In addition to offering into evidence the demand-letter table listing her costs, Newman testified to the following expenses:

- $1,550 and $300 for security and pet deposits (Hamaker admitted that Newman paid these.);

- $775 for half of a month's rent (Hamaker admitted that Newman paid this.);

- $150 on appliance assessments;

- $250 for a first mold report from Quest and $550 for a second mold report from Mold Inspection Services;[12]

- $1,633 for two teams of movers to move Newman out quickly (before December 1); and

- $961.24 for Newman's hotel stay.

There is no viable explanation for the jury's $13,810 award in total; as such, the evidence is legally insufficient to support the entire award. *See Guevara v. Ferrer*, 247 S.W.3d 662, 669–70 (Tex. 2007).

There is, however, legally sufficient evidence to support a portion of the $13,810 award, rescuing Newman from a reversal and rendition of a take-nothing

---

[12]Thigpen testified that he charges $250 to $350 and that he spent about three hours at the home.

judgment and allowing us to suggest a remittitur. *See id.* at 670. In fact, Hamaker concedes in his brief that there is evidence of at least some of the actual damages and does not dispute most of the expenses Newman sought in her demand-letter table. He also does not dispute the $775 paid for half of a month's rent or the $550 for the second mold report from Mold Inspection Services. He takes issue only with the inclusion of the statutory penalties, the $750 Bella Vida deposit, and the security and pet deposits Newman paid to him.

We agree with Hamaker that the award of the statutory penalties as constructive-eviction damages would be erroneous. *See Parkway*, 901 S.W.2d at 441. But that is where our agreements end. We reject his argument that the $750 deposit for the apartment Newman moved to is not recoverable because, as he argues, "a deposit is an asset, not a damage." Hamaker cites no authority for this nonsensical position.

We also reject Hamaker's argument that Newman cannot recover her security and pet deposits as constructive-eviction damages. Hamaker urges that the deposits were awarded as part of the bad-faith retention award, but that is not a correct reading of the jury charge or the verdict. The jury charge asked what amount of deposit was wrongfully withheld from Newman, and the jury answered $1,850.[13] The trial court

---

[13]Hamaker does not dispute that the security and pet deposits totaled $1,850.

30

then used that total to calculate the statutory penalty to be awarded to Newman for

his bad-faith retention, as it explained in its judgment:

> The Texas Property Code states that a Plaintiff whose security deposit is unlawfully withheld is entitled to "an amount equal to the sum of $100, three times the amount wrongfully retained, and the applicant's reasonable attorney's fees." Tex. Prop. Code [Ann.] § 92.354[.] The jury found that Defendant withheld one thousand eight hundred fifty dollars and zero cents ($1,850.00). Applying the statutory multiplier to this amount for bad[-]faith withholding, plus $100, yields a total of **five thousand six hundred fifty dollars and zero cents ($5,650.00)** and the Court hereby awards that amount to Plaintiff.

Thus, the trial court did not award the security and pet deposits as actual damages for

the bad-faith retention claim. Hamaker's argument of double recovery is therefore

wrong in this respect.

As such, after subtracting $8,150 in statutory penalties claimed in Newman's

demand-letter table of damages and adding the additional $775 and $550 expenses, we

conclude that a rational basis existed for Newman to recover $8,906.63 for Hamaker's

constructive eviction of her. Accordingly, we suggest a remittitur of $4,903.37 for

Newman's damages resulting from Hamaker's constructive eviction of Newman. If,

within 15 days of the date of this opinion, Newman files in this court a remittitur of

$4,903.37,[14] then our subsequent judgment will reform the trial court's judgment in

accordance with the remittitur and, as reformed, affirm that judgment. *See* Tex. R.

App. P. 46.3, 46.5. Unless a voluntary remittitur is timely filed, we will reverse the

---

[14]Thereby reducing her recovery on this claim to a total of $8,906.63.

trial court's judgment and remand the case to the trial court for a new trial on the issues of liability and damages. *See* Tex. R. App. P. 44.1(b); *Willis*, 199 S.W.3d at 276 & n.27.

### 3. Failure to Repair or Remedy

In his second issue, Hamaker attacks the jury's finding of his liability for failing to repair or remedy the property.

In order to establish liability for the landlord's failure to repair or remedy a condition, the plaintiff must establish (1) the existence of a landlord-tenant relationship; (2) a condition on the leased property that materially affected the physical health or safety of an ordinary tenant; (3) that the condition was either caused by ordinary wear and tear or not caused by the tenant, a lawful occupant, a member of the tenant's family, or the tenant's guest or invitee; (4) that the tenant gave the landlord notice to repair or remedy the condition; (5) that the tenant was not delinquent in paying rent when notice of the condition was given; and (6) that the landlord had a reasonable time to repair or remedy the condition but did not make a diligent effort to do so. Tex. Prop. Code Ann. §§ 92.052, .056(b). Hamaker does not dispute that the presence of mold threatens physical health and safety; he also admitted as much in his testimony.[15] He only contests whether Newman established

---

[15]Confusingly, buried in his eleventh issue before us, Hamaker asserts that Newman never testified to any health-and-safety threats, but in the same paragraph he also admits to her testimony regarding the mold as a health-and-safety concern. As

32

that he did not make a diligent effort, within a reasonable amount of time, to repair or remedy the harmful condition.

While Section 92.056 does not require that the landlord successfully repair or remedy a materially harmful condition, it does require a "diligent effort." Tex. Prop. Code Ann. § 92.056(b)(5). Based on the facts before us, there is legally and factually sufficient evidence to support the jury's implied finding that Hamaker did not make a diligent effort to remedy the mold problems in the home.

Newman testified at trial that when she moved in on November 16, she was disturbed by the condition of the property, particularly a musty smell in the kitchen indicative of mold. According to her testimony, she immediately notified Hamaker by phone call and text message and sent him photos of the "gross" conditions of the home.[16] Those photos include areas where Thigpen later observed "mold-like" substances and water damage. According to Newman's testimony, Hamaker reacted by yelling at her and calling her a liar; at trial, Hamaker denied such behavior but did admit that he had told her that he would not come investigate her concerns until December 5, 19 days later.

we conclude, the jury was in the best position to determine the credibility of their opposing testimonies to the mold conditions.

[16]Newman does not argue that any of the other conditions threatened to materially affect her physical health or safety, so our analysis is limited to the mold evidence.

33

In his brief, Hamaker asserts that the first notification of possible mold was in Newman's November 23 letter, which he received late on November 25. And though Hamaker has steadfastly denied the presence of mold, he argues that he acted quickly by traveling to the property on November 29 and addressing Newman's complaints by spraying areas with bleach "as a precaution." He dismissed concerns about mold underneath wallpaper, arguing that "mold is common underneath wallpaper" and wallpaper should "never" be peeled back to expose the mold underneath. He testified that he also performed other repairs while at the duplex, including repairing a leak in the water heater and cleaning air-conditioning registers.

It was the jury's role to weigh Hamaker's denials of the presence of mold against the strong evidence of substantial mold and "mold-like" growths within the property. On November 23, Thigpen documented "[v]isible mold-like growth, elevated moisture content, [and] water damage or staining" throughout the home and testified at trial that the home's state required substantial and proper remediation, including removing any effected drywall and removing the kitchen-sink cabinet which covered a "black slurry of solution" likely the result of a plumbing leak. And perhaps most notably, the jury also heard Thigpen's expert opinion that mold cannot be remediated by the application of a bleach solution.

The jury also had the benefit of the prior and future tenants' testimony asserting Hamaker's reluctance to perform repairs or maintenance. Both Wirth and Reyes testified to Hamaker's refusal to repair shower tiles that were falling off and

34

leaks in the bathroom, as well as his seemingly stubborn insistence to do most repairs himself. Reyes, who rented the home about eight months after Newman moved out, testified to "big black spots" in the bathroom, the dishwasher and garbage disposal overflowing in the kitchen, and leaks in the bathroom and living room. He also recalled an area of the sheetrock that was so wet that "it was like a sponge when you would push it."

One of our sister courts considered a comparable set of facts in *Lost Creek Ventures, LLC v. Pilgrim*, No. 01-15-00375, 2016 WL 3569756 (Tex. App.—Houston [1st Dist.] June 30, 2016, no pet.) (mem. op.). In *Lost Creek*, the tenant argued that the landlords failed to make a diligent effort to address an "ongoing rodent infestation of the leased premises. *Id.* at *5. The tenant had reported an area as "inundated with rat feces," producing an odor problem and a "stench in the house." *Id.* at *5. The landlords hired an extermination company that sprayed and disinfected the property, but the rodent infestation continued. *Id.* at *6. The reviewing court held that the evidence was legally and factually sufficient to support the judgment against the landlords for their failure to remedy the situation. *Id.*

Based on the record before us, the evidence is legally and factually sufficient to support the judgment against Hamaker for his failure to remedy the mold problem in the home. We therefore overrule his second issue.[17]

### 3. Bad-Faith Retention

In his third issue, Hamaker complains that the trial court erred by assessing a penalty for his retention of Newman's security deposit because there was insufficient or no evidence that his retention was done in bad faith. His argument can be divided into two parts: (1) whether Newman's failure to give 30 days' notice of surrender relieved him of his duty to return the deposit and if it did not, (2) whether he acted in bad faith by retaining the deposit.

### a. Notice provision in the lease agreement

A landlord is statutorily required to refund his tenant's security deposit on or before the 30th day after the date the tenant surrenders the premises. Tex. Prop. Code Ann. § 92.103(a). Landlords may condition the return on the tenant's advance notice of surrender, but any such condition "is effective only if the requirement is underlined or is printed in conspicuous bold print in the lease." *Id.* § 92.103(b).

The parties argued at trial over whether the lease contained an underlined or boldfaced requirement that Newman give 30 days' notice of her termination of the

---

[17]To the extent Hamaker's first issue can be construed to include a complaint regarding the damages awarded for his failure to repair or remedy, we overrule it. The trial court awarded Newman $2,050, the statutorily provided civil penalty of one-month's rent plus $500. Tex. Prop. Code Ann. § 92.0563(a)(3). We affirm that award.

36

lease in order to trigger the return of the security deposit; the jury agreed with Newman that any such requirement was not underlined or in bold. Hamaker admits in his brief that the only underlined relevant provisions in the lease are as follows:

> 5.      MOVE OUT PROCEDURES:    TENANT shall furnish LANDLORD with at least thirty (30) days prior written notice before TENANT vacates the PREMISES.
>
> . . . .
>
> [7.(b)] (vii) TENANT shall have complied with all of the provisions of paragraph (5) above[.]

These provisions do not meet the requirements of Section 92.103(b). While they may have required a 30-day notice of her surrender of the property, they did not state in underlined or conspicuous bold print that such notice was a requirement to obtain a refund of her security deposit. Likewise, the provision that failing to comply with the notice requirement "entitle[d Hamaker] to retain the security deposit . . . as liquidated damages" was neither underlined nor printed in bold. It therefore did not meet the clear requirements of the statute that the condition be so printed, and to hold otherwise would fail to give full effect to the statute. *Id.*; *see also Tex. Lottery Comm'n v. First St. Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010) (reiterating the requirement that courts construe statutes in accordance with their plain meaning and presume the legislature selected its language with care and with a purpose in mind for each word or phrase). We therefore reject Hamaker's argument that he was entitled

to retain the security deposit because Newman did not give 30 days' notice of her vacation of the property.

### b. Evidence of Hamaker's bad faith

Hamaker's other argument against the bad-faith-retention verdict is that there was "little or no evidence of bad faith offered by Newman at trial." He argues that there was, instead, "an abundance of evidence of good faith" by Hamaker and Donna, and he specifically refers us to his (1) providing Newman a written statement of deductions he was taking from her security deposit six days after she moved out, (2) not charging Newman for the deductions that exceeded the deposit, and (3) he and Donna's cleaning of the home in order to secure a new tenant.

Before returning a security deposit, a landlord "may deduct . . . damages and charges for which the tenant is legally liable under the lease or as a result of breaching the lease." Tex. Prop. Code Ann. § 92.104(a). He may not retain anything to cover "normal wear and tear." *Id.* § 92.104(b). If he retains all or part of the deposit, he must provide a "written description and itemized list of all deductions," subject to exceptions inapplicable here. *Id.* § 92.104(c). "A landlord who fails either to return a security deposit or to provide a written description and itemization of deductions on or before the 30th day after the date the tenant surrenders possession is presumed to have acted in bad faith." *Id.* § 92.109(d).

To the extent Hamaker argues that his provision of written deductions negated any evidence of his bad faith, he misinterprets this statutory presumption: it only

prevented the automatic presumption that he acted in bad faith. *See id.* § 92.109(c), (d); *see also Schneider v. Whatley*, 535 S.W.3d 236, 241 (Tex. App.—El Paso 2017, no pet.).

It was the jury's role to weigh the evidence and measure the credibility of the witnesses, including Newman and the Hamakers. *See Golden Eagle Archery*, 116 S.W.3d at 761. The jury was presented with ample evidence that it could have reasonably interpreted as showing Hamaker's bad faith and it was within their purview to conclude that this outweighed any evidence of good faith. A landlord acts in bad faith if he "acts in dishonest disregard of the tenant's rights or intends to deprive the tenant of a lawfully due refund." *Schneider*, 535 S.W.3d at 241 (quoting *Johnson v. Waters at Elm Creek, L.L.C.*, 416 S.W.3d 42, 47 (Tex. App.—San Antonio 2013, pet. denied)). The jury was presented with ample evidence that a reasonable person could have interpreted as Hamaker's dishonest disregard of Newman's rights as a tenant or his intention to deprive her of her lawfully due refund.

We have already discussed extensively the evidence of the home's poor condition. Additionally, Newman testified at length to her exchanges with Hamaker, describing his temper, ill demeanor, and his unwillingness to properly clean or repair the property. She testified to the handyman's responses to the mold and his apparent disgust at how Hamaker failed to maintain his properties. Circumstantial evidence of Hamaker's difficult demeanor and unwillingness to work with his previous and subsequent tenants was also presented; the jury could have considered all of this in

determining whether Hamaker acted in bad faith by retaining the deposit. The jury also had substantial direct evidence of Hamaker's behavior from Hamaker himself, who steadfastly denied the presence of mold, even in the face of an expert witness's testimony about the extensive mold problem.

Additionally, the jury could have reasonably concluded that the deductions Hamaker had claimed from the security deposit were unfounded and in bad faith. Apart from his allegations of damages resulting from Newman's alleged "failure to comply" with the lease, he sought a $750 reletting fee, a $100 cleaning and trash removal fee, and a $165 fee for "[c]arpet pet treatment & cleaning." The jury was free to determine that those deductions were unreasonable, particularly in light of Newman's brief stay in the home.

Considering all of the evidence favorable to the jury's finding, there is legally sufficient evidence of Hamaker's bad faith in refusing to return Newman's deposit. And considering the record as a whole, the evidence is factually sufficient to support the finding. We therefore reject Hamaker's third issue challenging the bad-faith retention portion of the judgment against him.[18]

---

[18]Hamaker does not challenge the amount of money awarded to Newman for his bad-faith retention, $5,650, which is equal to the sum of $100 and three times the portion of the deposit wrongfully withheld. *See* Tex. Prop. Code Ann. § 92.109(a).

## B. HAMAKER AS AN EXPERT WITNESS

In his fifth issue, Hamaker complains of the trial court's ruling denying his request to testify as an expert witness in "general repairs and maintenance."[19] Hamaker argued at trial that he had done "over 6,000 repairs involving general maintenance and plumbing," including installing a sprinkler system.[20] Newman objected to his testifying as a general-repairs expert because Hamaker had not shown any specialized training in that area. We agree with Newman.

We review a trial court's admission or exclusion of expert testimony for an abuse of discretion. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). We will not disturb the trial court's discretion absent clear abuse—that is, where the trial court acted without reference to any guiding rules or principles. *Id.*; *Gainsco Cty. Mut. Ins. Co. v. Martinez*, 27 S.W.3d 97, 104 (Tex. App.—San Antonio 2000, pet. dism'd). The party offering the expert's testimony bears the burden to prove the witness is qualified

---

[19]The trial court did allow Hamaker to testify as an expert witness regarding HVAC issues because Hamaker is a licensed HVAC technician. It rejected his request to testify as an expert on mold remediation, a decision he concedes on appeal was "understandable."

[20]In his brief, Hamaker refers us to an affidavit he filed in response to Newman's motion to exclude his testimony as an expert witness. The affidavit was never admitted into evidence. *See Ceramic Title Internat'l, Inc. v. Balusek*, 137 S.W.3d 722, 724–25 (Tex. App.—San Antonio 2004, no pet.) (explaining that pleadings and documents attached to pleadings are not evidence unless offered and admitted as such by the trial court). We note that even if it had been admitted it would not change our resolution of this issue.

under Rule 702. *Broders*, 924 S.W.2d at 151–52; *see* Tex. R. Evid. 702. That rule requires experts to be qualified "by knowledge, skill, experience, training, or education" and that their testimony "help the trier of fact." Tex. R. Evid. 702.

Hamaker's assertion that he had done thousands of "repairs involving general maintenance and plumbing" does not establish any specialized knowledge, skill, experience, training, or education such that the trial court's ruling was an abuse of discretion; nor does it establish that he held an expert opinion that would have assisted the jury. *See id.* Even if we were to be generous and interpret Hamaker's testimony as establishing that he had "knowledge and skill not possessed by people generally,"[21] that would not itself establish that his "expertise" would have assisted the jury. *See Broders*, 924 S.W.2d at 153.

We cannot conclude in this case that the trial court abused its discretion by determining that Hamaker was not qualified to testify as an expert witness on "general repairs and maintenance," and we therefore overrule his fifth issue.

## C. JURY CHARGE

In his sixth issue, Hamaker complains of the trial court's rejection of two of his requested jury questions: "Did Newman act in a manner that was inconsistent with

---

[21]To be clear, we do not reach that conclusion based on his vague assertions.

42

an intention of avoiding or terminating the lease?" and "Did Newman voluntarily surrender[] possession of the premises?"[22]

Hamaker argues that the first question related to Newman's alleged "waiver of rescission." He elaborates that the question "would have asked the jury if Newman's actions"—making repair requests in her November 23 letter and paying her apartment security deposit before she moved out of the duplex—"were consistent with avoiding or terminating her lease."

Trial courts are required to submit only those questions, instructions, and definitions "which are raised by the written pleadings and the evidence." Tex. R. Civ. P. 278. Hamaker never pleaded an affirmative defense of waiver, nor did he request a trial amendment. *See Gibbins v. Berlin*, 162 S.W.3d 335, 342 (Tex. App.—Fort Worth 2005, no pet.). The trial court therefore did not err by refusing Hamaker's requested question. *See id.*

Regarding the second question, Hamaker argues that the trial court should have submitted the second question ("Did Newman voluntarily surrender[] possession of the premises?") because Newman surrendered the duplex by paying a $450

---

[22]Before trial, Hamaker filed five pages of requested jury instructions and questions. He pursued a ruling only on the excerpted two on the record in court. To the extent that he refers to any of the other requested instructions and questions, he forfeited any error related to those by not pursuing a ruling on them on the record. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43–44 (Tex. 2007); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (op. on reh'g). *See also* Tex. R. Civ. P. 274.

application fee to her new apartment building. Hamaker has not supplied any legal support for such a theory and corresponding question, nor are we aware of any. Without such support, the trial court did not err by declining to submit the question. *See* Tex. R. Civ. P. 278.

We therefore overrule Hamaker's sixth issue.

### D. PERJURY ACCUSATIONS

In his fourth issue, Hamaker accuses Newman of perjury and asserts that we should relieve him from the final judgment for her alleged misrepresentations. He provides no basis in Texas law for our being able to do so, nor are we aware of any.[23] His complaints of allegedly inconsistent discovery answers were matters for the trial court to resolve, and his complaints of inconsistent trial testimony were matters for the jury's consideration of Newman's credibility and the weight to be given her testimony. *Golden Eagle Archery*, 116 S.W.3d at 761. We decline to substitute our opinion for that of the jury. *Id.* We overrule Hamaker's fourth issue.

---

[23]To the extent Hamaker alleges as part of this issue that Newman acted with "unclean hands," he never pleaded that affirmative defense nor requested a jury question addressing it, thereby waiving any unclean-hands argument. Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1); Tex. R. Civ. P. 94 (regarding affirmative defenses). We further note that unclean hands is an equitable remedy that is generally reserved for those cases in which "the defendant has been seriously harmed and the wrong complained of cannot be corrected without applying the doctrine." *Park v. Escalera Ranch Owner's Ass'n, Inc.*, 457 S.W.3d 571, 597 (Tex. App.—Austin 2015, no pet.).

44

## E. Video Streaming of Photos to Jury Room

In his ninth issue, Hamaker argues that the trial court erred by allowing Newman's exhibits—digital photographs[24] of the property's condition—to be video streamed on a continuous loop to a television in the jury room during deliberations. After the jury exited the courtroom to deliberate, Hamaker objected to their continued streaming during deliberations. The trial court pressed Hamaker to suggest an alternate method for the jury to be able to view the photos while deliberating, and he suggested that the photos be given to the jury on a USB drive to view on a computer. The trial court rejected that suggestion on the basis that allowing the jury access to a computer would provide them access to the internet. The trial court pressed Hamaker—not Newman's counsel—for another alternative, but Hamaker did not have one. The trial court determined that streaming the photos on a continuous loop was the only option and allowed it.

On appeal, Hamaker does not argue that the photographs could not be viewed or considered by the jury while deliberating. *See* Tex. R. Civ. P. 281; *Tex. Emp. Ins. Ass'n v. Crow*, 221 S.W.2d 235, 236 (Tex. 1949) (interpreting Rule 281 as allowing photographs to be taken into jury deliberations). Rather, he takes issue with their continuous showing to the jury while they deliberated, painting it as a "force[-]fed video [that] could be likened to brainwashing."

---

[24]Hamaker did not object to the admission of the digital photographs into evidence.

45

We would be remiss if we did not address the absurdity of this situation. First, the trial court should not have put the burden on Hamaker to figure out how to provide the jury with Newman's photo exhibits—that burden should have been given to Newman and her counsel, who provided the digital exhibits apparently without planning for how they would be given to the jurors to review during deliberations.

Second, based on our research, this appears to be an unprecedented situation. The closest analogy we can draw could be that of a trial court's impermissible comment on the weight of the evidence in that allowing the photos to be shown on a continuous loop might have exaggerated their significance. *See Imagine Auto. Grp. v. Boardwalk Motor Cars, Ltd.*, 430 S.W.3d 620, 645 (Tex. App.—Dallas 2014, pet. denied) (noting in the jury-charge context that an impermissible comment on the weight of the evidence occurs when a trial court "exaggerates, minimizes, or withdraws some pertinent evidence from the jury's consideration"). As technology becomes more prevalent in the courtroom—and the jury room—trial courts and attorneys alike would be well-served to proceed with caution and work to avoid similar situations.

That being said, we cannot conclude based on the entirety of the record before us that allowing the digital photographs to be played on a loop during deliberations rose to the level of reversible error. To reach such a conclusion, we must determine that the continuous loop of the photos caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court.

46

Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). We do not reach that determination based on the record before us.

There is no indication that the photos being displayed on a loop in the jury room may have caused the jury to reach an improper judgment. Hamaker did not object to the admission of the digital photographs into evidence. And in addition to the photos' depictions of the property's conditions, the jury had heard Newman's, Reyes's, and Wirth's descriptions of the poor condition of the property and Thigpen's descriptions and opinion of the mold issues at the property. Viewing the record as a whole, we cannot conclude that the video loop of the photos caused the rendition of an improper judgment. *See Mid-South Bottling Co. v. Cigainero*, 799 S.W.2d 385, 388 (Tex. App.—Texarkana 1990, writ denied); *cf. Adams v. State*, No. 2-05-379-CR, 2007 WL 495190, at *21–22 (Tex. App.—Fort Worth Feb. 15, 2007, pet. denied) (mem. op., not designated for publication) (holding in a criminal case that trial court's allowing State to play on loop ten times video of police-officer victim's death was harmless error, if error at all, in light of the "great deal of evidence" indicating intoxicated defendant had struck and killed officer). We therefore overrule Hamaker's ninth issue.

### F. REQUEST FOR JUDICIAL NOTICE

In Hamaker's tenth issue, he argues that the trial court erred by denying his request that it take judicial notice of Section 295.303 of the Texas Mold Assessment Remediation Rules, which are promulgated by the Texas Department of State Health

Services.  However, Hamaker's reference was out of date and that section was no longer in effect at the time of the September 2019 trial.  *See* 25 Tex. Admin. Code Ann. § 295.303, *repealed by* 43 Tex. Reg. 515 (2018).  We therefore decline to conclude that the trial court erred by refusing to take judicial notice of a repealed rule.

To the extent that Hamaker claims in his brief that he had "intended" to seek judicial notice regarding provisions of the Texas Property Code, he failed to preserve any such argument by first presenting it to the trial court.  *See* Tex. R. App. P. 33.1(a)(1)(A); Tex. R. Evid. 103(a)(1).

Finally, Hamaker mentions within his tenth issue that the trial court took judicial notice of an eviction proceeding he had filed against a tenant in 2018 but refused to take notice of his dismissing the case after the tenant paid her rent.  His argument neglects to mention that this took place during Hamaker's direct examination as a witness, that he never asked the court to judicially notice the dismissal, and that Newman's counsel immediately noted, "And in addition to suing Krystal Reyes, **which admittedly I believe that suit was dismissed** . . . ."  Finally, he argues that he was "not allow[ed] to comment or object" but he testified in narrative form explaining the eviction proceeding.  There is no basis for this portion of his judicial-notice complaints.

Having found no error, we overrule Hamaker's tenth issue.

## G. ADDITIONAL COMPLAINTS

In Hamaker's eleventh, twelfth, and thirteenth issues, he alleges various abuses of discretion by the trial court in its administration of the proceedings and complains that the cumulative effect of the trial court's errors "created a [r]unaway [j]ury."

### 1. Hamaker's Litigious History

Part of Hamaker's eleventh issue relates to Newman's introduction of his history of suing his tenants in small-claims court. First, he focuses on a November 2018 hearing on his motion for sanctions against Newman for alleged discovery misconduct.

Hamaker moved for the trial court to sanction Newman after he deemed Newman's discovery responses to be "evasive and incomplete." At the hearing on Hamaker's motion, Newman's counsel responded with exhibits including her original and amended responses, correspondence with Hamaker, and—"[in] the interest of justice"—a list of nearly 100 Denton County cases in which Hamaker had sued people, predominantly his own tenants, whom Newman's counsel referred to as "helpless, often people of color." Hamaker objected on the basis of relevance to the admission of the list, but the trial court overruled his objection and admitted the exhibit "for the sole purpose[] of making a determination as to whether or not justice will be done if the Court were to grant a request for sanctions from what appears to

be . . . somewhat of a [vexatious] litigant[25] based upon these documents." Newman's counsel later clarified that he had researched whether Hamaker could be declared a vexatious litigant and determined that he could not because the cases had been filed in small-claims court.

In response to Newman's counsel's assertions, Hamaker argued that he had never singled out anyone based upon their race or ethnicity and only filed for eviction when his tenants did not pay their rent. He repeated his assertion that Newman's discovery answers had been late and incomplete and requested his travel expenses from his Arkansas home. The trial court denied his motion and noted that even if it had believed sanctions were warranted, there had been no evidence submitted of Hamaker's costs.

Hamaker now complains of Newman's counsel's "people of color" comment, but there is no indication that he suffered any harm as a result of such a comment. We therefore decline to attribute any significance to the remark—made in a pretrial hearing—in this appeal of the jury's verdict. *See* Tex. R. App. P. 44.1(a).

Hamaker further complains that evidence of his litigious history was presented to the jury at trial. Prior to trial, the trial court granted a motion in limine seeking to

---

[25]Reading the record, it appears that the hearing became tense among both parties' counsel and the trial court. At one point, the trial court threatened to hold Hamaker in contempt after Hamaker interrupted the trial court multiple times.

limit comments or testimony regarding Hamaker's other lawsuits. During Newman's testimony at trial, she recounted Hamaker's response to her November 23 letter:

> He called me the day after Thanksgiving in the morning under an unknown number, telling me he was giving me one last opportunity. And if I were to break this lease, he's going to sue me, which made sense because he has taken over a hundred of his tenants to court. So - -
>
> [Newman's Counsel]. Oh, my. Okay. All right. So - - so he said he was going to sue you.
>
> A. (Nodding head.)
>
> Q. Okay. What did you do in response to that?
>
> A. Well, he had also told me to get my ducks in a row and - - I took this very seriously. I had never been threatened to be sued before. I had two appliance companies come out and check the appliances and deem them not working and - -
>
> MR. HAMAKER: Your Honor - -
>
> A. - - and I had another mold company - -
>
> MR. HAMAKER: - - we have a motion in limine on this very issue.
>
> THE COURT: Response?
>
> MR. STONE: I don't believe that was granted, Your Honor. Just as to her contacting appliance companies and them coming to the property, that was not limined out.
>
> THE COURT: I don't think so either, so overruled. Overruled.
>
> MR. HAMAKER: Yes, Your Honor.

Contrary to the piecemeal fashion in which Hamaker represented this exchange in his brief, it is clear that he failed to timely object to Newman's reference to his suing "over a hundred of his tenants." To preserve error of an alleged limine

51

violation, a party must immediately object. *Pool*, 715 S.W.2d 629 at 637; *see In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 760 (Tex. 2013) (orig. proceeding); *In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 161 (Tex. App.—Houston [14th Dist.] 2014) (orig. proceeding). Hamaker therefore failed to preserve his complaint about Newman's reference, and we overrule this portion of his eleventh issue.

## 2. Asked-and-Answered Objections

Next, Hamaker complains of the trial court's sustaining Newman's asked-and-answered objections to Hamaker's attempts to elicit additional testimony from Newman about which repairs requested in the November 23 letter posed a risk to a tenant's health and safety, and he complains of the trial court's related admonishment in a bench conference:

> [Hamaker]. Which of these repairs do you believe affect the physical health and safety of an ordinary tenant?
>
> [Newman's Counsel]: Objection; asked and answered when we were discussing the photos.
>
> THE COURT: Sustained.
>
> Next question.
>
> Q. (BY MR. HAMAKER) Was this your first notice of the smoke alarm - -
>
> [Newman's Counsel]: Objection; asked and answered.
>
> THE COURT: Sustained. Next question. Come up here, both of you. On the record. It's becoming very clear that the only thing you're doing is trying to prolong this, and that is not going to work. So ask a new question - -

52

MR. HAMAKER: Okay.

THE COURT: - - or you'll find out the Rules give me broad discretion in a trial. Go back to your seat . . . and ask your next question.

MR. HAMAKER: Yes, Your Honor.

The trial court has broad discretion over the conduct of a trial; it has the inherent power to control the disposition of cases that come before it with economy of time and effort for itself, for counsel, and for litigants. *In re M.L.H.*, No. 2-01-025-CV, 2002 WL 35628727, at *12 (Tex. App.—Fort Worth Mar. 21, 2002, no pet.). As we have explained:

> A judge's ordinary efforts at courtroom administration, "even a stern and short-tempered judge's ordinary efforts at courtroom administration," are not sufficient to demonstrate bias or prejudice against a party. Thus, expressions of impatience, dissatisfaction, annoyance, or even anger on the part of the trial court do not ordinarily establish bias. . . . A court has the authority to express itself in exercising [its] broad discretion and may properly intervene to "maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time."

*Id.* (citing *Liteky v. United States*, 510 U.S. 540, 555–56, 114 S. Ct. 1147, 1157 (1994); *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001)).

The mold issues and requests for repair had been previously discussed during Newman's testimony. In fact, just prior to the objections, Newman answered "Yes" when Hamaker asked, "Is this your first repair request for a smoke detector?" The trial court did not abuse its discretion by sustaining Newman's objections to the cumulative questions. Nor do we conclude it abused its broad discretion by

53

cautioning Hamaker against any attempts to needlessly prolong the trial, especially when there is no indication that the jury overheard the bench conference of which Hamaker now complains.[26] *See id.* We therefore overrule the remainder of Hamaker's eleventh issue.

### 3. Voicemail

In Hamaker's twelfth issue, he again complains about the judge's administration of the trial proceedings. Hamaker had sought to play a voice message that Newman purportedly left for Hamaker when she was initially looking at the home and in which she referred to the home as "[r]eally nice." Even if we ignore the obvious preservation issues in Hamaker's failure to present a formal bill of exception, *see* Tex. R. App. P. 33.2 and Tex. R. Evid. 103(a)(2), his complaint is still unsuccessful because there was no dispute that Newman liked the home enough to sign the lease to begin with. To the extent he complains of the trial court's reluctance to allow extra time for Hamaker to play the recording—which the trial court described as inaudible—we do not conclude that the trial court abused its broad discretion to

---

[26]In his brief, Hamaker references an alleged comment made by Newman's counsel at mediation—prior to trial and outside the presence of any jury. We cannot and will not consider matters outside the record in our review. *See, e.g., Democratic Schs. Research, Inc. v. Rock*, 608 S.W.3d 290, 305 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

manage the trial proceedings by preventing any waste of time. *See M.L.H.*, 2002 WL

35628727 at *12. We therefore overrule Hamaker's twelfth issue.[27]

## 4. The "Runaway Jury"

Finally, Hamaker asserts in his thirteenth issue that the "[c]umulative effect of

[the trial court's] errors created a Runaway Jury." He is wrong. For the reasons

explained above, any error by the trial court did not amount to cumulative error that

rises to the level of reversible harm. *See Haskett v. Butts*, 83 S.W.3d 213, 221 (Tex.

App.—Waco 2002, pet. denied) (discussing cumulative harm). We therefore overrule

Hamaker's thirteenth and final issue.

## III. CONCLUSION

Having held that the evidence is insufficient to support the full amount of

damages awarded for Hamaker's constructive eviction of Newman, we suggest a

remittitur of $4,903.37. If, within 15 days of the date of this opinion, Newman files in

this court a remittitur of $4,903.37, then our subsequent judgment will reform the trial

court's judgment in accordance with the remittitur and, as reformed, affirm that

judgment. *See* Tex. R. App. P. 46.3, 46.5. Further, having held that the breach-of-

---

[27]Buried within his twelfth issue is also a request that we order the Denton County Clerk to serve all court orders. Hamaker failed to provide any support for such a demand and has therefore failed to properly present it to us. *See* Tex. R. App. P. 38.1(f–g). We are not obligated to "become advocates for a particular litigant" by performing research and developing argument for that litigant. *Tello v. Bank One, N.A.*, 218 S.W.3d 109, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (internal quotation omitted).

contract damages award constituted a double recovery, we order the trial court's judgment modified to delete that award.

Having overruled Hamaker's other issues, we affirm the remainder of the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Delivered:  March 10, 2022